## FLOWERS v. UNITED STATES.
### No. 10495.

Circuit Court of Appeals, Eighth Circuit.
April 8, 1936.

Clarence E. Walsh, of Omaha, Neb., for appellant.

Frederick G. Hawxby, Asst. U. S. Atty., of Omaha, Neb. (Joseph T. Votava, U. S. Atty., Ambrose C. Epperson, Asst. U. S. Atty., both of Omaha, Neb., and Barlow Nye, Asst. U. S. Atty., of Lincoln, Neb., on the brief), for the United States.

Before GARDNER, VAN VALKEN-BURGH, and FARIS, Circuit Judges.

FARIS, Circuit Judge.

Appellant, hereinafter referred to as the defendant, was indicted in four counts for violations of the Harrison Anti-Narcotic Act, as amended section 1043 (a), title 26 U. S.C.A. Prior to the trial, counts 1 and 2 were dismissed by the government, and on a trial to a jury he was convicted on counts 3 and 4, and sentenced on each of the latter counts to imprisonment in a penitentiary for a term of three years; sentences to run concurrently.

Count 3 charged him with a sale of morphine, "not in or from the original stamped package," to one C. E. Clark, while count 4 charged a similar sale to one J. E. Goode, all at the city of Omaha, in Douglas county, Neb. Count 3 alleged that the sale was made at Twenty-Fifth and Seward streets, on November 14, 1934, while count 4 alleged that the sale therein relied on was made at Twenty-Third and Seward streets on November 6, 1934. Section 1043(a), supra, relied on as the basis of this prosecution, so far as pertinent, reads thus: "It shall be unlawful for any person to purchase, sell, dispense, or distribute any of the aforesaid drugs [mentioned in section 1040 (a)] except in the original stamped package or from the original stamped package; and the absence of appropriate tax-paid stamps from any of the aforesaid drugs shall be prima facie evidence of a violation of this section [subsection] by the person in whose possession same may be found."

We have found it quite difficult to correctly ascertain, in the light of the rules and the practice, what and which of the thirteen errors alleged are now relied on by defendant. He sets out and cites authorities on only five points which he reserves for argument, but some brief arguments are directed toward some others of his assignments of error. These points are: (a) That the court erred in refusing to direct the trial jury to acquit the defendant; (b) that the verdict was contrary to the law and the evidence; (c) that there was no evidence that the morphine alleged to have been sold did not come in or from an original stamped package; (d) that, in cases of a vital conflict between the witnesses for plaintiff and defendant in a criminal case, defendant should be allowed a wide range

in cross-examination; and (e) that the evidence in a criminal case must point to the accused as being the person who committed the offense, and mere conjecture or suspicion will not warrant conviction.

As said already, the sale charged in the third count was alleged to have been made to one C. E. Clark, an informer, who did not testify on the trial, for he had died before the case came on for hearing. The testimony as to the facts and details of this alleged sale came largely from one Schmit, long theretofore a government narcotic agent. Schmit said that he, having searched Clark in order to be certain that he had no money on his person, went with him to a point near the residence of defendant; that Clark went into a small frame house near Twenty-Fifth and Seward streets in Omaha (which apparently and from defendant's testimony was the residence of defendant), and in a minute came out; shortly thereafter Schmit saw defendant come out of a drugstore; Clark then went across the street to defendant, and the latter and Clark walked west on the north side of Seward street, while Schmit walked west on the south side of this street; when both parties had reached a point about halfway between Twenty-Fourth and Twenty-Fifth streets on Seward, Clark called out to Schmit "I haven't got any money"; Schmit then met Clark about the center of Seward street and gave him a $10 bill; thereupon Clark returned to the defendant. Both parties then continued to walk to the intersection of Twenty-Fifth street and Seward, where the witness saw Clark give defendant money and defendant gave Clark some change. Defendant then left, but shortly thereafter came back and handed Clark a package, which package Clark held in his hand till he crossed the street and handed it to the witness. This package contained morphine wrapped in cigarette papers, to which no revenue stamps were affixed.

This testimony is characterized and denounced by defendant as being so weird, fantastic, and ridiculous as to be, as a matter of law, wholly incredible. And this premise is one of the bases for his contention that the trial court should have directed a verdict on the third count. Defendant denied that he had ever sold any morphine to Clark, or that he had ever known Clark, or ever seen either him or Schmit till some three weeks after the alleged sale, when Clark came to defendant's house with the officers who arrested him. But as incidents affecting the credibility of the defendant, it was shown that he had said to Clark when the latter came with the officers to his house, "Come right in Eddie," and it also appeared in evidence that defendant had twice before been convicted of the unlawful sales of narcotics and sentenced to the penitentiary.

In this situation, and in the light of the evidence above detailed, we are of opinion that the evidence, not being so weird, fantastic, or ridiculous as to warrant the court in holding it incredible as a matter of law, was for the triers of fact. They believed Schmit, and obviously did not believe defendant.

Apposite to this point of the insufficiency of the evidence, defendant contends that there was not any evidence that the package in which the morphine was sold to Clark did not bear revenue stamps, nor was there any evidence that it did not come from an original stamped package. But Schmit says categorically that this morphine was wrapped in cigarette papers and bore no revenue stamps. He does say, as it would be expected he would say, that he had no knowledge whether it had or had not been taken from an original stamped package. Even if there had been no evidence of a lack of stamps on the cigarette paper wrapping, we might, following the analogy, if not the principle, of the case of Casey v. United States, 276 U.S. 413, 417, 48 S.Ct. 373, 72 L.Ed. 632, infer that there were no stamps affixed to the cigarette paper. For said Mr. Justice Holmes, speaking for the Supreme Court in that case where the morphine had been dissolved and soaked into a towel, "it safely may be inferred that he [defendant] did not proclaim his illegal purpose by putting stamps upon the towels." Here, however, the contention of defendant is met and destroyed by direct evidence of the lack of stamps and so inferences are not called for.

But defendant urges somewhat faintly, and without citing any authorities, that there was no proof that the morphine delivered to Clark did not come from an original stamped package. This contention of fact is well taken. If it was necessary to be shown in a prosecution of a peddler of narcotics, in contradistinction to a prosecution of one who had registered, then it was not shown and the case must be reversed. But we are of the opinion that in a case of an unregistered peddler such evidence is

not necessary. Obviously, if it is, the numerous convictions for unlawful sales under the statute here involved have been unlawful, and no further prosecutions can ever be sustained under this section 1043 (a), except in the most anomalous and unusual situations. For the insistence carries with it the necessity for the proof of an element of negation, ordinarily impossible of proof.

■ The existing statutory law governing the matters of taxation, handling and dealing in narcotics of the sort under discussion is derived largely from the original Act of December 17, 1914 (38 Stat. 785, as amended by the Act of February 24, 1919 [40 Stat. 1130], and the Act of February 26, 1926 [44 Stat. 96], 26 U.S.C.A. § 1040 et seq., 1383 et seq.). Other minor amendments have been made since; but none of these latter is relevant here. The result of these rather numerous amendments has been to add difficulties in construction. But the intention of Congress that the original act and the several amendments thereto should be construed as a whole seems fairly clear. If all this has brought about a condition of the law, which allows those charged with the enforcement of it too much latitude to pick and choose the criminal charge to be preferred against those who transgress it, this is for Congress and not for the courts.

■ Section 1043(a), supra, applies equally to wholesale dealers, to retail dealers, to physicians, dentists, veterinary surgeons, and other practitioners, as also to all other persons, whether registered or not. Other sections of the existing law require all such dealers, physicians, dentists, veterinaries, and other practitioners, who deal in or handle narcotics, to register according to their manner of dealing, and to pay annual taxes, the amounts whereof differ as the manner of dealing differs. Section 1383, title 26, U.S.C.A. By another section (section 1391, title 26, U.S.C.A.) wholesale dealers and retail dealers are defined, respectively, as those who sell "in the original stamped package" and as those who sell or dispense "from original stamped packages." No necessity existed to define a physician, a dentist, or a veterinary surgeon; since these words are used in their ordinary and dictionary meaning. What is meant by "other practitioners" is not relevant to the point involved; since obviously the term does not mean an illicit, curbstone peddler. None of those registered in his particular statutory category may lawfully invade the field of others

in other categories; for his registration and the amount of the tax paid fix his status.

■ All of those who register and pay the taxes required of them in their several classes may lawfully "purchase, sell, dispense or distribute" narcotic drugs "in * * * or from an original stamped package." So it is clear that one, at least, of the purposes of Congress in the passing of section 1043 (a), supra, was to prevent the dealing in narcotics, on which no taxes had been paid. The language used in the first two lines of the section is in the form of an absolute prohibition of purchase, sale, dispensing, and distribution. But this prohibition is wholly removed by the language of the exception; so that all of those who have registered and paid the tax required of those in the class to which the handler belongs may either purchase, sell, dispense, or distribute, as his registration may contemplate; provided he does so "in * * * or from the original stamped package." The above general proviso or exception is in the disjunctive and not the conjunctive, which indicates that one who is registered is not, in order that he may lawfully sell, required to sell both in and from an original stamped package, which, of course, would be not only a ridiculous, but an impossible, requirement. Wholesale dealers may sell in the original stamped package, but they are not allowed to sell by retail from such a package. Retail dealers may sell or dispense from, but not in, the original stamped package; while registered physicians, etc., may administer from an original stamped package, but may not sell in such a package. Purchasers through physicians' prescriptions are protected by other provisions of the section, supra, and their status is irrelevant here. The section nowhere seems to afford any protection to an unregistered, illicit peddler. In short, some may lawfully sell and handle in, and some from, an original stamped package, depending on their registration, but not both in and from. Those who are not registered may not legally sell at all.

■ From this it would seem plain that the exception does not contemplate compliance therewith in the conjunctive, but only in the disjunctive. Any other construction would convict Congress of having enacted an absurdity into law, and we are admonished by a well-known canon of statutory construction that this should not be done, if it can be avoided upon any rational view. United States ex rel. Anderson v. Anderson (C.C. A.) 76 F.(2d) 375.

Moreover, it must be borne in mind that under section 1043(a), supra, the sole reason for proving the absence of stamps is to enable the government to rely upon the lack of stamps as "prima facie evidence of a violation of this subsection." This is a legally permitted use of so-called prima facie evidence in a criminal case. Casey v. United States, 276 U.S. 413, 418, 48 S.Ct. 373, 374, 72 L.Ed. 632. In the above case it is said: "The statute here talks of prima facie evidence, but it means only that the burden shall be upon the party found in possession to explain and justify it when accused of the crime that the statute creates."

However valuable this shifting of the burden may be in a prosecution for an unlawful purchase, it is difficult to see either necessity for it, or value in it, in a case like this at bar, when the fact of a sale is clearly shown aliunde. As already indicated upon other phases, the difficulty arises from including in one section and in one sentence thereof numerous persons and numerous offenses, as to whom and which an all-inclusive rule is not possible of application in a thoroughgoing manner.

■ So much is said in order to stress the conclusion that the Congress could not have intended that, as a condition precedent to a successful prosecution for a sale under section 1043(a), supra, it must be shown both that the morphine when sold was not contained in an original stamped package and that it did not come from an original stamped package. By that it must have meant that the proof of either, as the circumstances called for, would suffice. It may well be that, if defendant had offered proof that he had registered as a retail dealer, or as a physician and paid the tax required by the Narcotic Act and its amendments (of which payment his registration would be proof), then, absent evidence that the morphine sold by him was not taken from an original stamped package, he should have been acquitted. But such proof of registration and payment of the tax are burdens put by the statute on the defendant. Sections 1387–1388 (c), title 26 U.S.C.A.; Fiunkin v. United States (C.C.A.) 265 F. 1; Robinson v. United States, 53 App.D.C. 96, 288 F. 450; Taylor v. United States (C.C.A.) 19 F.(2d) 813; Gerardi v. United States (C.C.A.) 24 F.(2d) 189; Haggerty v. United States (C.C.A.) 52 F.(2d) 11; Rothman v. United States (C.C.A.) 270 F. 31. And no such proof of registration and payment was offered in the case; hence the reason for referring to defendant as a peddler.

■ Numerous prosecutions and convictions have been had under this section and sustained on appeal. In none of them, so far as we can find, has the precise question here ever been discussed or even urged. Rossi v. United States (C.C.A.) 9 F.(2d) 362; Perez v. United States (C.C.A.) 10 F.(2d) 352; Dean v. United States (C.C.A.) 266 F. 695. In all of them it seems to have been assumed and acted on by all counsel and all courts that, in a case like this at bar, proof unrebutted of a lack of stamps on the package sold, proof of a sale being present, was sufficient. And it seems that it was not deemed necessary to go further and show, not only that the package sold bore no stamps, but that the morphine which was sold did not come from an original stamped package. As pointed out already, proof of the latter fact is ordinarily well-nigh impossible. So, while the question is troublesome as it is raised here, upon an indictment for a sale, which took pains to plead that the sale charged was not made "in or from an original stamped package," we are constrained, as already forecast, to the conclusion that the most it was necessary to prove here (if even that was necessary) was that the package when sold bore no stamps, in order to put in force the statutory rule of prima facie evidence, and that it was not necessary to go further and prove that the morphine sold was not taken from an original stamped package. The question whether an indictment for a sale would or would not be good under section 1043(a), supra, even if it failed to negative the above-quoted exception, is not squarely before us, though presented by strong implication. Cf. Haggerty v. United States (C.C.A.) 52 F. (2d) 11; Rothman v. United States (C.C.A.) 270 F. 31; Taylor v. United States (C.C.A.) 19 F.(2d) 813. So we defer ruling on it till we shall meet it in a case face to face, and confine our opinion to the precise situation confronting us. If so it be that this view would seem to involve a variance between allegata and probata, this may be eliminated by discarding as surplusage so much of the allegata as was not necessary in law to be proved. Bailey v. United States (C.C.A.) 5 F.(2d) 437; Johnson v. Biddle (C.C.A.) 12 F.(2d) 366; Mathews v. United States (C.C.A.) 15 F.(2d) 139; Maresca v. United States (C.C.A.) 277 F. 727; Bratton v. United States (C.C.A.) 73 F.(2d) 795.

 Defendant contends further that, in case of a very serious conflict between the evidence of the government and that of the accused, a very wide range of cross-examination is permissible. There are cases which so hold, and we have no particular quarrel with the rule. But the rule urged has no application here. For the record shows but one instance wherein cross-examination by defendant of any witness was at all restricted or curtailed. The counsel for defendant on cross-examination asked the government's witness Schmit whether the "department had not been giving him (meaning the informer Clark) drugs in payment for his services." To this question the court sustained an objection, and defendant excepted. Even assuming that Schmit knew what had been done and all that had been done by the department, and that by "drugs" counsel meant narcotic drugs, the question under the situation was, as the court ruled, irrelevant. Clark had not testified, and did not testify, because, as said already, he died before the case was tried. If he had been a witness, and if a proper foundation had been laid, and if the question had fallen fairly within the witness Schmit's examination in chief, it might well have been proper cross-examination. Moreover, no offer of proof was made, and we are left in the dark as to whether, if Schmit had been allowed to answer, he would have said "Yes" or "No" or "I do not know." In this latter situation, as the cases are unanimous in holding, the trial court may not be held to have erred.

 The contention is made by defendant that in a criminal case mere conjecture or suspicion of guilt is not sufficient to uphold conviction, but that the evidence must point to defendant as the person who committed the crime. Again, there can be no gainsaying in principle the legal proposition put forth. But also again, on the record before us, the contention is not at all apposite. Here the triers of fact had before them a simple question of veracity, and that question was whether they should believe the witness Schmit, who categorically testified to the sale and to the details thereof, or whether they should believe defendant, who denied them. As said already, in discussing the alleged insufficiency of the evidence, Schmit was not at all impeached, while there were incidents which seriously affected defendant's credibility; he was the defendant testifying for himself; he was

a two-time ex-convict; and he had denied any prior acquaintance with the informer and vendee, Clark, when an incident shown in evidence tended to prove that he had known Clark long enough to be free with his given name. All those things the jury had the right to consider, and, so considering, to determine whether they should believe Schmit or the defendant. The evidence was not at all circumstantial, it was direct, and involved neither conjecture nor suspicion, but merely the simple question of truth when a diametrical conflict of veracity arises. The jury saw fit to believe Schmit, as the law permitted, since they were the sole judges of the credibility of the witnesses, and that is the sum and end of the matter.

 Defendant complains that neither he nor his wife, who testified for him, was permitted to testify as to an alleged personal assault and serious battery committed on him by certain officers, who were not witnesses, in an effort to extort a confession. To the details and the act the trial court sustained an objection, for that such evidence was irrelevant to any issue on trial. In this ruling the court committed no error. The defendant made no confession. If he had, as a result of the battery, the proffered testimony would have been admissible in order to show that the confession was not voluntary, and so not competent. Therefore it is too plain for argument that in the situation before the court evidence of a battery, abortive and impotent in result, was wholly irrelevant. Defendant's learned counsel concedes that this is the present state of the law on the point, but he insists that the rule is wrong and should be re-examined and overturned. This for the reason, as he urges, that defendant would not have been beaten had the agents for the government (some of whom he says did the beating) not been convinced of the inherent evidentiary weakness of the case against defendant, and so the evidence was relevant as throwing light upon the view taken of the case by the government's agents; in short, that these agents, deeming the case weak, had sought to strengthen it by obtaining a confession. No witness who testified in the case is charged with having been a party to the battery sought to be proved. The question of the strength or weakness of the case was a matter to be deduced by the jury from the evidence before it, and not from some opinion held as to its

weakness by some agent or agents who did not even testify. The insistence of admissibility, even if appellee could be bound by an undisclosed motive held in mind by some of its agents, yet smacks of a far-fetched psychology too intricate to be injected into the real and relevant issues of a case on trial to a jury without great danger of harm, and a miscarriage of justice.

The trial court properly deemed the testimony irrelevant, and he was correct; however relevant would be an official investigation and prosecution and dismissal of the brutal perpetrators, if the facts offered to be shown are found to be true. So the matter is one for another court or body and another time, and was wholly irrelevant to any issue in the case at bar.

Defendant contends that he was not permitted to testify in rebuttal of a statement made by one Kelly, who testified for the government. This is true, and the refusal would have been error, but for the fact, as the record discloses, that he had already been asked and had denied the fact to which Kelly testified. Kelly had said, as bearing upon the fact of defendant's acquaintance with Clark, the informer, that defendant, on the night of his arrest seeing Clark at his door, had called out to him, "Come right in Eddie." On defendant's cross-examination he had been asked if he had so called out to Clark, and he had denied it. He was not entitled to deny it but once.

We have not at all examined the alleged errors directed toward the conviction of defendant on count 4 of the indictment. For the sake of the argument, it may be conceded, without deciding, that a charge in an indictment of a sale of morphine to J. E. Goode is not proved by evidence of a sale to Carl Montgomery. But, whatever may be the rule, it has no present application to the extent of serving as a ground for reversal. This for the reason that in a case of concurrent sentences, on more than one count as here, the failure of one count or errors committed in the trial thereof are not grounds for reversal. Claassen v. United States, 142 U.S. 140, 12 S.Ct. 169, 35 L. Ed. 966; Kalen v. United States (C.C.A.) 196 F. 888; Hardesty v. United States (C. C.A.) 168 F. 25; Stokes v. United States (C.C.A.) 39 F.(2d) 440.

It results from what has been said that the case should be affirmed, and so we order.